KALISTHENIC EXHIBITION CO. Inc., v. EMMONS, Collector.

(Circuit Court of Appeals, First Circuit. January 27, 1916.)

No. 1152.

CUSTOMS DUTIES ⬡⟿22—PROHIBITION OF IMPORTATION—STATUTORY PROVISIONS.
    Negatives of a prize fight, from which positive films are to be made and exhibited before the members and guests of clubs, societies, associations, and athletic clubs, with no limitation as to the number of guests, is within the inhibition of Act July 31, 1912, c. 263, 37 Stat. 240, as supplemented by the Act of October 3, 1913, c. 16, par. 380, 38 Stat. 151.
    [Ed. Note.—For other cases see Customs Duties, Cent. Dig. § 18; Dec. Dig. ⬡⟿22.]

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit by the Kalisthenic Exhibition Company, Incorporated, against Willis T. Emmons, Collector. From a decree (225 Fed. 902) dismissing the bill, complainant appeals. Affirmed.

Robert T. Whitehouse, of Portland, Me. (Woodman & Whitehouse, of Portland, Me., Loucks & Alexander, of Schenectady, N. Y., Tyler, Corneau & Eames, of Boston, Mass., and McLaughlin & Stern, of New York City, on the brief), for appellant.

John F. A. Merrill, U. S. Dist. Atty., of Portland, Me. (Arthur Chapman, Asst. U. S. Dist. Atty., of Portland, Me., on the brief), for appellee.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

PUTNAM, Circuit Judge. The statutes on which this case rests are the Act of July 31, 1912, 37 Stat. 240, and the Customs Act of October 3, 1913, c. 16, par. 380, 38 Stat. 151. The parts necessary to be cited from the earlier act are as follows:

"It shall be unlawful for any person * * * to bring or cause to be brought into the United States from abroad any film or other pictorial representation of any prize fight or encounter of pugilists, under whatever name, which is designed to be used or may be used for purposes of public exhibition." Section 1.

The statute contains other language intended to prohibit the circulation in any way, or the exhibition of "any matter or thing herein forbidden to be deposited for mailing, delivery or carriage in interstate commerce," and closes with a severe penalty for its violation.

The Customs Act of October 3, 1913, chapter 16, paragraph 380, 38 Stat. 151, is as follows:

"Photographic cameras, and parts thereof, not specially provided for in this section, photographic dry plates, not specially provided for in this

section, 15 per centum ad valorem; photographic-film negatives imported in any form, for use in any way in connection with moving-picture exhibits, or for making or reproducing pictures for such exhibits, exposed but not developed, 2 cents per linear or running foot; if exposed and developed, 3 cents per linear or running foot; photographic-film positives, imported in any form, for use in any way in connection with moving-picture exhibits, including herein all moving, motion, motophotography or cinematography film pictures, prints, positives or duplicates of every kind and nature, and of whatever substance made 1 cent per linear or running foot: Provided, however, that all photographic films imported under this section shall be subject to such censorship as may be imposed by the Secretary of the Treasury."

A question is fairly made whether the earlier act covers negative films, which class of films are involved in this case; but the later act clearly applies to both negative and positive films, and by its closing provision apparently bars importations except subject to censorship; and, as no censorship has been imposed which reaches this case, the bar therefor continues, so far as we perceive.

This bill was brought by the importer to restrain the collector of the port of Portland and Falmouth from refusing entry of the films in question. In view of the decision of the Supreme Court in Weber v. Freed, 239 U. S. 325, 36 Sup. Ct. 131, 60 L. Ed. ——, passed down December 13, 1915, that court laid down a rule sufficiently broad to determine absolutely the proposition that, so far as we have cited these statutes, the power of Congress to enact them was absolute; and at the present they stand effectually in the way of any importations which are prohibited by their spirit and letter.

The assignment of alleged errors on this appeal is, on well-settled rules of practice, too general to be effective, except on the single proposition that the film here was not within the inhibition of the statute, because it was a negative film, and not a positive one. The later act effectually bars importations of either class of films pending censorship to be imposed by the Secretary of the Treasury, and none has been imposed. It is true the assignment of alleged errors specifically covers the proposition that the film in the present case was not one which is "designed to be used, or which may be used for purposes of public exhibition," within the terms of the act of July 31, 1912. Perhaps, on a fair construction of the legislation to which we have referred, the film could not be imported for any purpose pending the establishment of a censorship by the Secretary of the Treasury; but in the present case the District Court decided that this negative film might "at least be used for purposes of public exhibition." The illustrations given by the District Court in that connection firmly establish the correctness of this conclusion, and that the conclusion was correct is also established by the following extract from the testimony of Harry H. Frazee, executive and managing officer of the complainant corporation, and its principal witness. After some hesitation on the part of the court and counsel as to the proper method of ascertaining what were the purposes of the complainant corporation or its officers or agent, in connection with this film, the following occurred:

"The Court: You may now ask him his own intention; he is the manager.

"Q. What is your own intention and purpose in regard to the use of these

films, or any positives made from the films, as manager of the corporation? A. My intention is that they shall be exhibited for private exhibitions before clubs, societies, associations, and athletic clubs.

"Q. With what contractual arrangements with the clubs? A. A flat sum for each exhibition.

"Q. That is, you agree to exhibit for a flat sum to a club? A. A picture and an operator, and they pay a flat sum for them, and they have the absolute charge.

"Q. And under this arrangement the exhibition is to the members of the clubs and such guests as they may invite? A. Yes.

"Q. Is it your purpose to attempt to use the negatives themselves for any purposes of exhibition directly? A. No, sir.

"Q. What do you propose to do? A. Have a positive made from the negative. You couldn't use the negative.

"Q. (By the Court). To have a positive made from the negative and exhibit to the clubs and their guests? A. Yes, sir."

Following this is some discussion with the witness as to the amount involved in exhibitions, private or public. As we understand the testimony, the amount involved in a private exhibition for clubs "at the very least conservative estimate would be $100,000 at the present time"; while "the value of the unlimited right of public exhibition would be $1,000,000 at least." In any fair view of the case, what the exhibitors might undertake to describe of the various methods of exhibition intended, the one as private and the other as public, it is plain that in any view of the facts, considering that the clubs would limit admissions only according to their own determinations, the exhibitions fairly intended, or fairly possible or probable, were practically unlimited; and, any fair construction on exhibitions made under the circumstances described, and yielding so large returns, could not in any fair sense be regarded as other than public.

It might well be said that the purpose of the importation was in violation of the original statute, although the importation was of merely a negative film, even if it could be said that the statute from any point of view made or intended to make a distinction as between the negative film and the positive film. The language of the act is very broad; so broad that it relates to films, not only designed, but which may be used, for purposes of public exhibition. The production of a negative film, and its importation, is inevitably only the first step in the final use as a positive film. The whole, from the beginning to the end, is only a development from taking the negative film to the final exhibition of the positive film. The negative film has no practical use of value, as the evidence shows, except to be developed in a positive form and exhibited in connection therewith. The whole is a process in which every step counts. It is only fair to say that the negative film is, it is true, the first step, but a necessary step, in the exhibition by the use of the positive film, and naturally and inevitably leads up to that exhibition and that use; and in a fair sense of the expression the negative film is obtained only for the purpose of setting in motion a progress of events which result in the final exhibition by the use of the positive film. However, it is probable that the two statutes must be construed together, to be operative and to accomplish any purpose whatever, and therefore it is plain that the film in any form, whether positive or negative, is barred until there has been

some positive action on the part of the Treasury Department to regulate its use in some manner which the public morals justify and support.

The decree of the District Court is affirmed, and the appellee recovers his costs.

DODGE and BINGHAM, Circuit Judges, concur in the result reached in the above opinion, believing the conclusion of the District Court, that the film in question is within the inhibition of the statute, to be correct.